

1  CARL A. WESCOTT
   8210 E. Via de la Escuela
2  Scottsdale, AZ 85258
   *in propria persona*
3  +1 276 773 7377

4

5                **UNITED STATES DISTRICT COURT**

6                   **DISTRICT OF CALIFORNIA**

7                                        CV24-01885

8  CARL A. WESCOTT,                    │ Civil Action No. _____
                                       │
9                        Plaintiff,    │ **PLAINTIFF'S VERIFIED LEGAL**
                                       │ **COMPLAINT FOR BREACH OF**
10 vs.                                 │ **CONTRACT and TORTIOUS**
                                       │ **INTERFERENCE WITH CONTRACT;**
11 MS. MONETTE STEPHENS;               │ **also seeking INJUNCTIVE RELIEF**
   DEPARTMENT OF CHILD SUPPORT         │
12 SERVICES (COUNTY OF SAN             │
   FRANCISCO),                         │
13                                     │
14                      Defendants.    │
                                       │
15 + DOES 1 through 10                 │
16 _____

17

18        Plaintiff Carl A. Wescott, proceeding *pro se,* and using the assigned legal claims of his entity

19 (Capital Ideas, WLL, Exhibit B) complains of Defendants Ms. Monette Stephens and the Department

20 of Child Support Services, and in support of his complaint, the Plaintiff states as follows.

21

22 **The Parties: Plaintiff and Defendants**

23

   1. Carl Wescott is an individual presently residing in Scottsdale, Arizona (his domicile).
24

25 2. Monette Stephens is an individual presently residing in San Francisco, California (her domicile).

26 3. Capital Ideas, WLL ("Capital Ideas") is the Plaintiff's limited liability company, that has signed

   **PLAINTIFF'S VERIFIED LEGAL COMPLAINT FOR BREACH OF**                     1
   **CONTRACT and TORTIOUS INTERFERENCE WITH CONTRACT**

1   contracts with twenty-one (21) African real estate developers and four (4) African gold miners.

2   Capital Ideas assigned its related legal claims to Carl Wescott (Exhibit B).

3   4.  Defendant Department of Child Support Services (San Francisco) is a California state

4       government agency in the County of San Francisco that assists in the collection and

5       enforcement of child support orders.  As per the Department of Child Support Services

6       ("DCSS") web site, "Our mission is to help families get the resources they need to thrive."

7

8   5.  To differentiate between Carl Wescott, the Plaintiff with the assigned legal claims of legal

9       person Capital Ideas, and Carl Wescott, the individual, "Carl Wescott" shall refer to the natural

10      person Carl Wescott.

11

12  6.  Collectively, the Plaintiff and the Defendants are "the Parties."

13

14  **Case summary**

15      The Plaintiff has focused almost exclusively on business outside of the United States for over

16  twenty years.  The Plaintiff has recently signed twenty-five customers in Africa to contracts with

17  success fees that range from millions of dollars to hundreds of millions of dollars.  The Plaintiff needs

18  to travel to Africa to best facilitate these deals, including site visits and due diligence trips with

19  investors.

20

21      Defendant Ms. Stephens filed to take away the Plaintiff's passport in January 2023 as the

22  Plaintiff was behind on support payments.  Defendant Ms. Stephens is aware that the Plaintiff has

23  many customers in Africa.  Defendant Ms. Stephens is aware that the Plaintiff has signed contracts

24  for hundreds of millions of dollars in success fees, for him to bring financing to larger real estate

25  developments in Africa (2000 units or more).

26

**PLAINTIFF'S VERIFIED LEGAL COMPLAINT FOR BREACH OF
CONTRACT and TORTIOUS INTERFERENCE WITH CONTRACT**

1

2    The Plaintiff filed paperwork with the Department of Child Support Services in San Francisco

3    and with Superior Court in San Francisco to modify his support payments based on a change of

4    circumstances. The Plaintiff is grateful to Ms.Louis Hupp, Ombudsman of the Department of Child

5    Support services, who worked out a deal ("the Contract") with Ms. Stephens in which the Plaintiff

6    would have six full calendar months of his passport being valid, so that the Plaintiff could travel to

7    Africa and make money.

8    The agreement with Ms. Stephens ("the Contract") needed to be verified by the Superior Court

9    in San Francisco in a hearing ("the Hearing") at 8:30 am on March 12th, 2024. In the Hearing, the

10   Plaintiff was surprised because the attorney for the Department of Child Support Services began the

11   hearing by stating that he and the Department of Child Support Services were against the agreement

12   that Ms. Stephens and the Plaintiff had reached (the Contract). The Department of Child Support

13   Services attorney then stated that he did not believe that the Plaintiff was capable of making any

14   money. The Department of Child Support Services attorney also stated that there was no evidence

15   that the Plaintiff will be able to make any money over the next six months (despite the signed contracts

16   with easy success fees). For these reasons and more, the Department of Child Support services came

17   out against the Contract.

18   Ms. Stephens then informed the Court "I've changed my mind", and that she had now decided

19   to breach the Contract with the Plaintiff. The ramification is that the Plaintiff will not have his

20   passport and cannot easily fulfill signed contracts that would give his company millions of dollars of

21   revenue fairly quickly. Ms. Stephens' breach will cost the Plaintiff millions of dollars or more, though

22   he is attempting to mitigate. Because Ms. Stephens will not be able to pay for the damages she is

23   causing by breaching the Contract, the Plaintiff is seeking injunctive relief from this Court, for the

24

25

26

3
**PLAINTIFF'S VERIFIED LEGAL COMPLAINT FOR BREACH OF
CONTRACT and TORTIOUS INTERFERENCE WITH CONTRACT**

1   Court to order Ms. Stephens to perform as promised (specific performance).  In addition, the Plaintiff

2   is seeking damages for the time period from March 12th, 2024 through the period when Ms. Stephens

3   does perform.

4

5

6   **Allegations regarding conspiracy between defendants**

7   7.  Plaintiff is informed and believes and thereon alleges that at all times material to this Complaint,

8       Ms. Stephens, as an individual, in addition to acting for herself and on her own behalf

9       individually, as well as for the benefit of his marital community (if any), is and was acting as the

10      agent, servant, employee, and/or representative of, and with the knowledge, consent, and

11      permission of, and in conspiracy with, each and all of the other Defendants (individual and

12      entities) and within the course, scope, and authority of that agency, service, employment,

13      representation, and conspiracy.

14

15  8.  Plaintiff further alleges on information and belief that the acts of each of the Defendants were

16      fully ratified by each and all of the other Defendants.  Specifically, and without limitation,

17      Plaintiff alleges on information and belief that the tortious actions, failures to act, breaches, and

18      negligence alleged herein and attributed to one or more of the specific Defendants were

19      approved, ratified, and/or done with the cooperation and knowledge of each and in conspiracy

20      with all other Defendants.

21

22  9.  In addition, upon information and belief, there are nefarious corporate, trust, and other entity

23      type Defendants involved in these conspiracies, currently unknown to Plaintiff.   They shall

24      emerge with the benefit of legal discovery.

25

26

4

**PLAINTIFF'S VERIFIED LEGAL COMPLAINT FOR BREACH OF
CONTRACT and TORTIOUS INTERFERENCE WITH CONTRACT**

10. Plaintiff is informed and believes and thereon alleges that at all times material to this Complaint, any and all such corporate entities, in addition to acting for itself and for its own behalf, was acting as the agent, servant, and/or representative of, and with the knowledge, consent, and permission of, and in conspiracy with, each and all of the Defendants (entity and individual) and within the course, scope, and authority of that agency, service, employment, representation, and conspiracy.

11. Plaintiff further alleges on information and belief that the acts of each of the Defendants were fully ratified by each and all of the Defendants. Specifically, and without limitation, Plaintiff alleges on information and belief that the tortious actions, failures to act, breaches, and negligence alleged herein and attributed to one or more of the specific Defendants were approved, ratified, and/or done with the cooperation and knowledge of each and in conspiracy with all other Defendants (individual and corporate).

## Jurisdiction and Venue

12. Ms. Monette Stephens lives and works in San Francisco, California, her domicile.

13. The Department of Child Support Services ("DCSS") has offices in San Francisco at 617 Mission Street.

14. Thus, this Court is the appropriate venue for adjudication of the Parties' issues.

15. This is an action for damages pursuant to 28 U.S.C. § 1332 based on diversity of citizenship and a claim for damages greater than US $75,000. Alleged damages are explained in further detail below as they are critical to this Court establishing subject-matter jurisdiction.

5

**PLAINTIFF'S VERIFIED LEGAL COMPLAINT FOR BREACH OF CONTRACT and TORTIOUS INTERFERENCE WITH CONTRACT**

16. Supplemental jurisdiction over the Plaintiff's California state law claims is pursuant to 28 U.S.C. § 1367 and the facts that the individual defendant lives and works in this district, the entity defendant is domiciled herein, and the tortious acts, non-acts, and negligence complained of herein occurred in this district, too.

## Subject-Matter Jurisdiction – Background and Legal Standards

17. With damages of $75,000 and the diversity of citizenship of Plaintiff and Defendants, the Plaintiff would qualify for United States District Court under 28 U.S. Code § 1332(a)(1):

DIVERSITY OF CITIZENSHIP; AMOUNT IN CONTROVERSY; COSTS

**(a)** The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between—
  **(1)** citizens of different States;    *(28 U.S. Code § 1332 (a)(1))*

18. The Plaintiff resides in Arizona and the Defendants are citizens of California.

19. Thus, the Parties have complete diversity of citizenship.

20. The Plaintiff will add the facts, logic, and reasoning supporting the Plaintiff's thinking that his recoverable damages will be greater than US $75,000.

21. To qualify for federal court under complete diversity of citizenship, the amount in controversy must exceed the sum or value of $75,000, exclusive of interest and costs *(28 U.S.C. § 1332(a) (2014))*.

22. The determination of the amount in controversy for federal subject matter jurisdiction is an issue decided under federal law. 14AA FEDERAL PRACTICE AND PROCEDURE § 3702 (4th ed.

**PLAINTIFF'S VERIFIED LEGAL COMPLAINT FOR BREACH OF CONTRACT and TORTIOUS INTERFERENCE WITH CONTRACT**

1    2014) [hereinafter "FEDERAL PRACTICE"]. See *Horton v. Liberty Mut. Ins. Co.*, 367 U.S. 348,

2    352 (1961).

23. Federal courts will, however, look to applicable state law to determine the nature of the plaintiff's

substantive claim and related damages. FEDERAL PRACTICE § 3702. See *Horton*, 367 U.S. at

352-353.

24. Numerous courts, including the United States Supreme Court have held that the amount in

controversy for jurisdictional purposes is measured by the direct pecuniary value of the right that

the plaintiff seeks to enforce or the value of the object that is the subject matter of the suit.

FEDERAL PRACTICE § 3702.5. See *Hunt v. Washington State Apple Advertising Com'n*, 432

U.S. 333, 97 S.Ct. 2434, 53 L. Ed. 1067 (1947).

25. The direct pecuniary value of the right is simply an estimate of the total amount in dispute rather

than an assessment of liability. *Lewis v. Verizon Communications, Inc.*, 627 F.3d 395, 400 (9th

Cir. 2010).

26. The amount in controversy is determined without considering accrued or accruing interest or the

costs associated with the lawsuit. (*28 U.S.C. § 1332(b)*)

27. Courts have held that collateral effects will not be taken into account when calculating the amount

in controversy. FEDERAL PRACTICE § 3702.5. See *Healy v. Ratta*, 292 U.S. 263, 267 (1934)

("the collateral effects of the decree, by virtue of stare decisis, upon other and distinct

controversies, may not be considered in ascertaining whether the jurisdictional amount is

involved, even though their decision turns on the same question of law."). See also *New England

Mortg. Sec. Co. v. Gay*, 145 U.S. 123, 130 (1892) ("It is well settled in this court that, when our

jurisdiction depends upon the amount in controversy, it is determined by the amount involved in

7

**PLAINTIFF'S VERIFIED LEGAL COMPLAINT FOR BREACH OF
CONTRACT and TORTIOUS INTERFERENCE WITH CONTRACT**

the particular case, and not by any contingent loss either one of the parties may sustain by the probative effect of the judgment, however certain it may be that such loss will occur.").

28. The amount in controversy may include compensatory damages including general and special damages such as pain and suffering and out of pocket loss. The amount in controversy may also include punitive damages. *Anthony v. Security Pac. Fin. Servs., Inc.*, 75 F.3d 311, 315 (7th Cir. 1996); *Watson v. Blankinship*, 20 F.3d 383, 386-387 (10th Cir. 1994).

29. When there is direct legal authority, by statute or contract, for the recovery of attorneys' fees, then the fee claim may be included in determining the amount in controversy regardless of whether the award of fees is mandatory or discretionary. *Galt G/S v. JSS Scandinavia*, 142 F.3d 1150, 155-1156 (9th Cir. 1998).

## **Subject-Matter Jurisdiction with the Alleged Facts of this Particular Case**

30. The Plaintiff plans to get an attorney for this case in the future when the Plaintiff can afford one.

31. The Plaintiff has already had to cancel a trip to the Central African Republic (the "CAR") to meet the President and for the Plaintiff's developer client to receive land for the beginning of a 5000 house project, thus meaning that the Plaintiff has lost the ability to perform on a contract that pays him 18.6 million Euros (Exhibit C).

32. The Plaintiff has also lost a customer, a gold mine in the Democratic Republic of Congo ("DRC"), that wanted to meet him in person to close the deal and sign the contract. That has already cost the Plaintiff US $400,000 of revenue, plus whatever the future stream of revenue from this customer would be.

**PLAINTIFF'S VERIFIED LEGAL COMPLAINT FOR BREACH OF CONTRACT and TORTIOUS INTERFERENCE WITH CONTRACT**

33. The Plaintiff hopes that after Ms. Stephens performs, that he will still be able to make those 18.6 million Euros over a few years, and that her breach, if rectified, will only delay 18.6 million Euros, rather than cause the permanent loss of that revenue.

34. But the US $400,000 is now permanently lost, if the Plaintiff cannot travel.

35. Given the $400,000 already lost and the other ramifications, the Plaintiff's base damages from Ms. Stephens' breach and DCSS' tortious interference far exceed the threshold ($75,000) for federal subject-matter jurisdiction.

## Narrative of Facts

36. The Plaintiff is a former international real estate developer with significant previous success who ultimately filed chapter 7 bankruptcy and started over again.

37. The Plaintiff has focused almost exclusively on business outside of the United States for over twenty years.

38. The Plaintiff has recently started a new business (Capital Ideas) and signed twenty-five customers in Africa to contracts with success fees that range from millions of dollars to hundreds of millions of dollars.

39. Twenty-one (21) of those customers are real estate developers of 2000 units of housing or more; four (4) are gold miners.

40. One such contract, for 18.6 million Euros of compensation (success fees), is in Exhibit C.

41. The Plaintiff needs to travel to Africa to facilitate these deals, including to close more business, do site visits, do due diligence trips with prospective investors, and to make a trip with the final confirmed investors for the legal work and closing.

9

**PLAINTIFF'S VERIFIED LEGAL COMPLAINT FOR BREACH OF CONTRACT and TORTIOUS INTERFERENCE WITH CONTRACT**

42. Defendant Ms. Stephens filed to take away the Plaintiff's passport in January 2023 as the Plaintiff is behind on support payments.

43. Defendant Ms. Stephens is aware that the Plaintiff has recently signed many customers in Africa.

44. Defendant Ms. Stephens is aware that the Plaintiff has signed contracts for hundreds of millions of dollars in success fees, for him to bring financing to larger real estate developments in Africa (2000 units or more).

45. The Plaintiff had filed paperwork with the Department of Child Support Services in San Francisco and with Superior Court in San Francisco to modify his support payments based on a change of circumstances.

**The Contract**

46. The Plaintiff is grateful to Mr. Louis Hupp, Ombudsman of the Department of Child Support services, who helped work out a deal ("the Contract") with Ms. Stephens in which the Plaintiff would have six full calendar months of his passport being valid, so that the Plaintiff could travel to Africa and make money.

47. The Contract was worked out over the phone on Monday, February 5th, 2024.

48. The full terms of the Contract are summarized in Exhibit A.

49. A short summary of the Contract is that the Ms. Stephens and the Plaintiff stipulated to reset the Plaintiff's relevant support payments through the present to $0. This would give the Plaintiff back his passport. Then, the Plaintiff would have six (6) full calendar months after a Court order approving the stipulation of $0 payments, during which time he would have his passport,

**PLAINTIFF'S VERIFIED LEGAL COMPLAINT FOR BREACH OF CONTRACT and TORTIOUS INTERFERENCE WITH CONTRACT**

and be able to travel.  In the seventh month through the twelfth month thereafter, the Plaintiff would pay Defendant Ms. Stephens $5,000/month.  That number would go up $5,000 while relevant every six months, so the Plaintiff would them pay Ms. Stephens $10,000 per month from month thirteen through month eighteen, and so on.

50. Though there are many emails and documents related to the Contract, Mr. Hupp will also be a key witness as to contract formation and the meeting of the minds between Ms. Stephens and the Plaintiff.

51. On February 5th, 2024, Mr. Hupp believed that the DCSS could assist Defendant Ms. Stephens and the Plaintiff in writing up their Contract in a form that a San Francisco Superior Court judge could sign and turn into a court order in February 2024.

52. Mr. Hupp informed the Plaintiff that a DCSS attorney could do that and that DCSS could submit it to the Court, so that the Court order would be effective the following week, in the week of February 12th through 16th, 2024.

53. Thus, the six months that the Plaintiff would have his passport and be able to make money in Africa were originally March 2024 through August 2024.  Then, the $5,000 per month that the Plaintiff would pay would start the following month, in September 2024.

54. The Plaintiff emailed Mr. Hupp a summary on Monday, February 5th, 2024 at 4:44 pm (Exhibit D).

55. To assist the DCSS attorney, the Plaintiff emailed Mr. Hupp the terms of the agreement, that the attorney could use as the starting point for the stipulation to be turned into a Court order (Exhibit E).

11

**PLAINTIFF'S VERIFIED LEGAL COMPLAINT FOR BREACH OF CONTRACT and TORTIOUS INTERFERENCE WITH CONTRACT**

56. Based on the knowledge that Ms. Stephens had formed the Contract with the Plaintiff, the Plaintiff moved forward on projects and planned visits to African countries including Ghana, South Africa, Lesotho, Niger, and the Democratic Republic of the Congo ("the DRC").

57. The Plaintiff followed up with Mr. Hupp on Thursday, February 8th, 2024, as the Parties were expecting to sign the DCSS-provided paperwork that week, the week of February 5th through February 9th, 2024 (Exhibit F).

58. On or around Friday, February 9th, 2024 (phone records will show the exact date and time), Mr. Hupp called to inform the Plaintiff that the DCSS could not draft the Contract in stipulation form and submit it to the Court as he had thought. The reason that the DCSS could not do that is that the Contract was not "guideline". Rather, the Contract was an independent agreement between Ms. Stephens and the Plaintiff, not based on a percentage of the Plaintiff's earnings.

59. Mr. Hupp suggested that the Plaintiff submit the terms of the Contract to San Francisco Superior Court to be approved by a Superior Court judge at a hearing on March 12th, 2024 at 8:30 am.

60. The parties – Ms. Stephens and the Plaintiff - confirmed that since the terms of the Contract would give the Plaintiff six (6) full calendar months of having his passport and being able to travel, that the six months that he would have his passport and be able to travel would now start in April 2024.

61. That is because the terms of the Contract would not become a Court order until March 12th, 2024.

62. Thus, as per the Contract the six (6) months that the Plaintiff would have his passport and be able to make money in Africa were now to be April 2024 through September 2024. Then, the $5,000 per month that the Plaintiff would pay would start the following month, in October 2024.

**PLAINTIFF'S VERIFIED LEGAL COMPLAINT FOR BREACH OF CONTRACT and TORTIOUS INTERFERENCE WITH CONTRACT**

63. On Sunday, February 18th, the Plaintiff drafted the stipulation that included the terms of the Contract. The Plaintiff submitted it to the Court for the March 12th, 2024 Court hearing that would result in the new Court order. The Plaintiff also emailed a copy to Mr. Hupp (Exhibit G).

64. Once again, the Plaintiff knew not only that Ms. Stephens had formed the Contract but also was honoring its terms. As per the Contract, the parties to the Contract simply agreed to slide the 6-full-month passport window back one month as it would take longer to get the Court order with the terms of the Contract. The Plaintiff continued to move forward on projects and planned visits to African countries including Ghana, South Africa, Lesotho, Niger, and the Democratic Republic of the Congo ("the DRC").

**The Hearing on March 12th – DCSS interferes with the Contract and Ms. Stephens breaches**

65. The Court hearing was scheduled for March 12th, 2024, at 8:30 am, in San Francisco.

66. The Plaintiff caught a 5:30 am flight to attend the hearing.

67. Ms. Stephens and the attorney for DCSS were in attendance. (The Plaintiff apologizes as he does not know the name of that attorney; otherwise he would have used the attorney's name)

68. In the Hearing, the Plaintiff was surprised because the attorney for the Department of Child Support Services began the hearing by stating that he and the Department of Child Support Services were against the agreement that Ms. Stephens and the Plaintiff had reached (the Contract).

69. The Department of Child Support Services attorney then stated that he did not believe that the Plaintiff was capable of making any money.

**PLAINTIFF'S VERIFIED LEGAL COMPLAINT FOR BREACH OF CONTRACT and TORTIOUS INTERFERENCE WITH CONTRACT**

70. The Department of Child Support Services attorney also stated that there was no evidence that the Plaintiff will be able to make any money over the next six months (despite the signed contracts with easy, huge success fees).

71. For these reasons and more, the Department of Child Support Services came out against the Contract.

72. Ms. Stephens spoke next in the hearing, right after the DCSS attorney.

73. Ms. Stephens then informed the Court "I've changed my mind", and that she had now decided to breach the Contract with the Plaintiff.

74. The ramification is that the Plaintiff will not have his passport and cannot fulfill signed contracts as planned that would give his company millions of dollars of revenue fairly quickly.

75. Defendant DCSS – relevant employees at DCSS including Mr. Hupp and the DCSS attorney – are aware that the Plaintiff was quite successful in his younger years, amassing over $100 million of assets in his 30s.

76. Defendant DCSS – relevant employees at DCSS including Mr. Hupp and the DCSS attorney – are also aware that the Plaintiff has signed contracts with many customers in Africa.

77. Defendant DCSS – relevant employees at DCSS including Mr. Hupp and the DCSS attorney – are also aware that the Plaintiff has signed contracts for hundreds of millions of dollars in success fees.

78. That was the whole point of DCSS supporting the Plaintiff in his suggested scenario and helping facilitate and negotiate the Contract with Ms. Stephens – for the Plaintiff to have those six (6) months to do some closings for some of his customers, to generate significant revenue, which would be of benefit to Ms. Stephens, too.

14
**PLAINTIFF'S VERIFIED LEGAL COMPLAINT FOR BREACH OF CONTRACT and TORTIOUS INTERFERENCE WITH CONTRACT**

79. So, the Plaintiff was particularly surprised that DCSS would state that DCSS was skeptical the Plaintiff would make any money and was opposed to the terms of the Contract!

**Forseeability and damages**

80. DCSS is aware that the Plaintiff has signed contracts for millions of dollars, tens of millions of dollars and more in Africa, and that interfering with the Contract will cost the Plaintiff millions of dollars or more over time.

81. Ms. Stephens is also aware that the Plaintiff has signed contracts for millions of dollars, tens of millions of dollars and more in Africa. Ms. Stephens is therefore aware that breaching the Contract will cost the Plaintiff millions of dollars, tens of millions of dollars or more over time.

82. The Plaintiff is doing his best to mitigate.

83. Full damages will be proven at jury trial, but as a quick snapshot of a small part of the consequential damages from the breach, the first three immediate impacts upon the Plaintiff are the following:

84. The Plaintiff has already had to cancel a trip to the Central African Republic (the "CAR") to meet the President and for the Plaintiff's developer client to receive land for the beginning of a 5000 house project, thus meaning that the Plaintiff has lost the ability to perform on a contract that pays him 18.6 million Euros (Exhibit C).

85. The Plaintiff has also lost a customer, a gold mine in the Democratic Republic of Congo ("DRC"), that wanted to meet him in person to close the deal and sign the contract. That has already cost the Plaintiff US $400,000 of revenue that he otherwise would have earned, plus whatever the future stream of revenue from this customer would be.

**PLAINTIFF'S VERIFIED LEGAL COMPLAINT FOR BREACH OF CONTRACT and TORTIOUS INTERFERENCE WITH CONTRACT**

86. Earlier today, the Plaintiff conducted a Zoom meeting with a representative of Niger ACI – the Ministry of Commerce and Investment - who wanted the Plaintiff to come visit now for the next steps on a project that over time will yield 13 million Euros to the Plaintiff's company (over approximately 6 years). The visit is not possible without a valid passport.

87. Like with the CAR, the Plaintiff hopes that Ms. Stephens performs soon – either by stipulation or after being ordered by this Court. Thus, in the best case, Ms. Stephens and DCSS then will only have delayed the Niger project and revenues, too, as opposed to causing the permanent loss of those revenues.

88. Damages will continue to accumulate until Ms. Stephens performs.

89. The Plaintiff is doing his best to mitigate.


**Planned Injunctive Relief:  Specific Performance**

90. Because Ms. Stephens will not be able to pay for the damages she is causing by breaching the Contract, the only equitable solution is specific performance.

91. After the Parties have appeared, if Ms. Stephens will not stipulate to performing for the Contract as previously agreed before her breach, the Plaintiff will seek injunctive relief from this Court for specific performance. The Plaintiff will file a Motion for the Court to order Ms. Stephens to perform as promised.

**PLAINTIFF'S VERIFIED LEGAL COMPLAINT FOR BREACH OF CONTRACT and TORTIOUS INTERFERENCE WITH CONTRACT**

**Damages**

92. After Ms. Stephens performs, which will greatly reduce the damages that she and DCSS would otherwise have to pay, the Plaintiff will prove the damages caused by the Defendants from the time period March 12th, 2024, until Ms. Stephens' performance, at jury trial.

93. Given the tortious acts and non-acts of the Defendants, the Plaintiff, unfortunately, had been left with no choice but to file this legal complaint in hopes that justice can be served.

**Jury trial**

94. Under the Seventh Amendment to the United States Constitution, the Plaintiff has a right to a jury trial for his Constitutionally-protected petitioning rights. (Also, as per *Fed. R. Civ. P 38(b)*).

95. The Plaintiff hereby respectfully requests a jury trial on all issues raised herein, including all triable facts and issues related to his current causes of action and any facts, issues, requests, and/or causes of action that the Plaintiff or his future attorney may add within the timelines allowed by this Court.

### Count I – Breach of Contract
(Ms. Stephens)

96. The Plaintiff realleges paragraphs 1-95 as if fully set out herein.

97. The Plaintiff entered into a valid contract – the Contract - with Defendant Ms. Stephens.

98. The Contract featured an offer, an acceptance, consideration and a meeting of the minds.

99. The Plaintiff has fully performed.

17
**PLAINTIFF'S VERIFIED LEGAL COMPLAINT FOR BREACH OF CONTRACT and TORTIOUS INTERFERENCE WITH CONTRACT**

100. After Ms. Stephens performs so that the Plaintiff has his passport, the Plaintiff will continue to fully perform, by making the payments to Ms. Stephens as agreed in the Contract in months 7 through 12 ($5,000/month), months 13 to 18 ($10,000/month), and beyond.

101. Ms. Stephens breached the parties' contract on March 12th, 2024.

102. The Plaintiff has been significantly damaged by Ms. Stephens's breach of contract.

103. Ms. Stephens' breach is the proximate cause of the damages to the Plaintiff.

104. Among other financial damages, the Plaintiff has permanently lost US $400,000 he would otherwise be earning, and another 18.6 + 13 million Euros (31.6 million Euros) of revenue has been delayed, at best.

105. Damages will continue to accumulate until Ms. Stephens performs.

106. All allegations for this cause of action shall be fully proven at jury trial, as shall the precise amount of damages.

### Count II – Tortious Interference with Contract
(Department of Child Support Services)

107. The Plaintiff realleges paragraphs 1-95 as if fully set out herein.

108. The Plaintiff and Defendant Ms. Stephens formed a valid, enforceable contract – the Contract.

109. Defendant DCSS was fully aware of the Contract.

110. Indeed, Mr. Hupp and DCSS was involved in the discussions. The Defendant helped negotiate the Contract!

111. Defendant DCSS was fully aware of the contracts that the Plaintiff has signed for millions of dollars, tens of millions of dollars, and more.

18

**PLAINTIFF'S VERIFIED LEGAL COMPLAINT FOR BREACH OF CONTRACT and TORTIOUS INTERFERENCE WITH CONTRACT**

112.    For reasons that will become clear in written discovery responses, in a future deposition, and in testimony and evidence at trial, Defendant DCSS then intentionally and willfully interfered with the Contract by inducing Ms. Stephens to breach the contract.

113.    Indeed, immediately following Defendant DCSS' tortious acts, citing factual inaccuracies and making ridiculous objections to Ms. Stephens and the Court, Ms. Stephens then did breach the Contract.

114.    DCSS' interference was a significant factor in inducing Ms. Stephens' breach.

115.    Ms. Stephens' breach has damaged the Plaintiff.

116.    Ms. Stephens' breach is the proximate cause of those damages to the Plaintiff.

117.    Part of those damages are the loss of US $400,000 in consulting revenue in the DRC, and the impact of the delay (at best) of another 31.6 million Euros.

118.    All allegations and the precise amount of damages shall be fully proven at jury trial.

WHEREFORE, PLAINTIFF PRAYS:

(a) As to Count I for all direct and consequential damages the Plaintiff incurred as a proximate result of Defendant Ms. Stephens breaches of the Contract;

(b) As to Count II, for all direct and consequential damages the Plaintiff incurred as a result of Defendant DCSS's tortious interference with the Contract as well as for the imposition of exemplary damages to deter Defendant DCSS from tortiously interfering with contracts in the future;

**PLAINTIFF'S VERIFIED LEGAL COMPLAINT FOR BREACH OF CONTRACT and TORTIOUS INTERFERENCE WITH CONTRACT**

(c) For reasonable compensation for the value of his time in representing himself while he cannot afford an attorney (*quantum meruit*);

(d) For reasonable future attorney's and paralegal fees and costs including administrative, filing, service, Court reporter, jury fees, travel costs and for all other reasonable costs of this action and;

(e) For such other and further relief as this Court deems just and proper.

RESPECTFULLY SUBMITTED

_____
Carl A. Wescott, *pro se*
March 20th, 2024

---

## **VERIFICATION**

I, Carl A. Wescott, under penalties provided by California law as well as the federal laws of the United States of America, certify that the facts set forth in this instrument are true and correct, except as to matters therein stated to be on information and belief and as to such matters the undersigned certifies as aforesaid that he verily believes the same to be true.

_____

**PLAINTIFF'S VERIFIED LEGAL COMPLAINT FOR BREACH OF CONTRACT and TORTIOUS INTERFERENCE WITH CONTRACT**

## **EXHIBIT A** – the terms of the Contract

Parties stipulate to reset the Plaintiff's relevant support payments through the present to $0

After a Court order approving the stipulation, the Plaintiff will have 6 full calendar months of $0 payments to give him time to close one or more deals.

In the 7th calendar month through the 12th calendar month after the Plaintiff gets his passport back, the Plaintiff will pay $5000/month to Defendant Ms. Stephens

In the 13th calendar month through the 18th calendar month after the Plaintiff gets his passport back, the Plaintiff will pay $10,000/month to Defendant Ms. Stephens

In the 19th calendar month through the 24th calendar month after the Plaintiff gets his passport back, the Plaintiff will pay $15,000/month to Defendant Ms. Stephens

In the 25th calendar month through the 30th calendar month after the Plaintiff gets his passport back, the Plaintiff will pay $20,000/month to Defendant Ms. Stephens

In the 31st calendar month through the 36th calendar month after the Plaintiff gets his passport back, the Plaintiff will pay $25,000/month to Defendant Ms. Stephens

In the 37th calendar month through the 42nd calendar month after the Plaintiff gets his passport back, the Plaintiff will pay $30,000/month to Defendant Ms. Stephens

21
**PLAINTIFF'S VERIFIED LEGAL COMPLAINT FOR BREACH OF CONTRACT and TORTIOUS INTERFERENCE WITH CONTRACT**

*Exhibit B*

## ASSIGNMENT OF CAPITAL IDEAS, WLL CLAIMS

WHEREAS, CAPITAL IDEAS, WLL ("CAPITAL IDEAS"), is the owner of legal claims ("the claims") related to DCSS and Ms. Monette Stephens.

COMES NOW, CAPITAL IDEAS, that hereby sets forth and agrees as follows:

1. For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, CAPITAL IDEAS hereby assigns all legal right, title, and interest it may have in the claims, to Carl A. Wescott ("Wescott").

2. CAPITAL IDEAS waives all right, title, claim and interest in these legal claims, whatever it or they may be, to Wescott free and clear of any claims of itself.

3. Wescott shall have all legal rights and claim to the assigned legal claims. Wescott shall be afforded all legal rights and responsibilities pursuant to the legal claims as if he had personally done the deals that CAPITAL IDEAS did, and as if Wescott would have personally received the related revenues.

4. CAPITAL IDEAS makes no warranties or representations regarding the legal claims, and Wescott enters this Assignment after further review of the timeline and sequence of events.

5. Each party has had the opportunity to seek the guidance of an attorney of their own choosing in entering into this agreement.

6. In witness whereof, the Assignor CAPITAL IDEAS and the Assignee Carl Wescott have both executed this assignment on the March 2024 date set forth below. The assignment shall be effectuated when both parties have signed.


_____
Assignor CAPITAL IDEAS
March 20th, 2024


_____
Assignee Carl Wescott
March 20th, 2024

1

Exhibit C

## AGREEMENT FOR THE RAISING OF DEBT CAPITAL

**THIS *AGREEMENT FOR THE RAISING OF DEBT CAPITAL*** (this "Agreement") is made on the 6th day of December 2023, which both Parties have signed.

**BETWEEN**

**SCCGI SA** (Société Centrafricaine de Construction et de Gestion  Immobilière) **"S2CGI SA",** the future CAR project's SPV to be created, represented by **ITS** (International Trading Services), major shareholder, represented by **Mr. Guerson NGANADEKOE**, a company in the CAR, which expression shall where the context so admits includes its agents, successors in title and assigns, **of the first part**;

**AND**

**CAPITAL IDEAS WLL,** hereinafter referred to as **"CAPITAL IDEAS-USA",** hereunder represented by **Mr. Carl WESCOTT**, a recently-formed Bahrain limited liability company, which expression shall where the context so admits includes its agents, successors in title and assigns, **of the second part**.

Each is a **"Party"** to this Agreement and they are referred to collectively as the **"Parties"**.

**WHEREAS:**

a) Acting at the benefit and on behalf of **"S2CGI SA"**, the project's future SPV to be created, **ITS** is a company in the CAR that has a large master-planned project on 250 hectares in Bangui neighborhood, that encompasses 5,000 units of housing, significant solar infrastructure, and recreational and uses (project description and business plan in Exhibit A).

b) **CAPITAL IDEAS-USA** is a consultancy whose objective is to assist real estate developers with ideas and implementations that will lower developer cost, improve ROI and profits, create and monetize new product types, optimize site definition, creation, and marketing/sales.

c) More germane to this opportunity, **CAPITAL IDEAS-USA** also facilitates the process of raising capital by qualifying and structuring deals, packaging them up to meet underwriting requirements, sourcing investors and lenders, and then making the introductions that result in needed capital/financing for the developer on its projects.

d) **CAPITAL IDEAS-USA** wishes to assist **"S2CGI SA"**, the project's future SPV to be created hereunder represented by **ITS,** in financing this entire Bangui project with the 5,000 units of housing and solar to begin with, and many more projects in the future.

**NOW THEREFORE, THE PARTIES HEREBY AGREE AS FOLLOWS:**

1. **Assumptions and Factual Representations**

   **"S2CGI SA"**, the project's future SPV to be created hereunder represented by **ITS,** warrants and represents that it owns or will own all 250 hectares in Bangui neighborhood that include the planned 5,000 units of for-sale housing product and that it has all necessary building permits for at least the first 1,000 units and is "shovel-ready". On behalf of **"S2CGI SA"**, **ITS** will get building permits as needed for each phase, ahead of time.

   **CAPITAL IDEAS-USA** has the knowledge, experience, and relationships to raise 100% of the capital needed (186 million Euros) for **S2CGI SA'** project. The building permits are a necessary condition, and an As Developed appraisal that an investor-lender will accept is the other requirement.

2. **Construction Loan Strategy**

   For each phase, the investor-lender will advance the funds for a certain number of units (perhaps starting with 500 units, and then ramping up from there) and infrastructure including solar. Then S2CGI SA will construct those units, sell them, and pay back that particular construction loan. Then we simply repeat the process for each phase, loan->construction->sales->loan payback, ramping up units and parallelizing so we can build and sell all 5,000 units as quickly as the market will bear.

3. **Further Representations and Warranties**

   Each Party represents and warrants that it has full rights, powers and authority to enter into this Agreement without the violation of any contractual, legal or other obligation to any corporate entity or person. The terms and conditions shall constitute a binding and enforceable agreement between the Parties and their agents/successors-in-title. The principals of each Party, **Mr. Guerson NGANADEKOE** and **Carl WESCOTT**, are hereby bound by the Agreement as well.

4. **Responsibility of ITS,**

   **ITS** will provide all necessary documents and will hire an appraiser for the necessary As Developed appraisal.

5. **Responsibility of CAPITAL IDEAS-USA**

   **CAPITAL IDEAS-USA** will facilitate the raising of 100% of the capital required for the construction of the 5,000 units (divided into phases), starting with ~500 of those units (exact number to be finalized based on appraisal value and expected absorption rate).

As per information recently provided (Exhibit A), **S2CGI SA** will need approximately 186,000,000 Euros for the project. Those numbers will go up over time due to inflation and a rise in labor and building costs.

## 6. Two relevant signed contracts

The two relevant and interrelated contracts that have been signed or are about to be signed are:

1) **CAPITAL IDEAS-USA** and **ITS** have executed a *NON-DISCLOSURE AND NON-CIRCUMVENTION AGREEMENT.*

2) This *AGREEMENT FOR THE RAISING OF DEBT CAPITAL* outlines how **CAPITAL IDEAS-USA** will bring in all needed capital for **S2CGI SA'** housing (5,000 units), and also how **CAPITAL IDEAS-USA** will be compensated for successful raises.

## 7. Non-Circumvent

**CAPITAL IDEAS-USA** and **ITS** have already agreed not to circumvent each other and their respective relationships. Thus, for all investors introduced to **S2CGI SA** (directly or indirectly), **CAPITAL IDEAS-USA** will be compensated for successful raises soon and in the future, including each time if the same investor or lender invests multiple times.

## 8. Decisions

**CAPITAL IDEAS-USA** will make recommendations, but all decisions will be made by **S2CGI SA.**

## 9. Success Fees

For each tranche of ready, willing and able capital delivered to **S2CGI SA**, **S2CGI SA** will pay **CAPITAL IDEAS-USA** a 10% consulting fee (success fee).

**S2CGI SA** will pay no fees up front, no consulting, and no expenses to **CAPITAL IDEAS-USA.**

**S2CGI SA** will only pay **CAPITAL IDEAS-USA** when money for the project has arrived from investors identified and introduced by **CAPITAL IDEAS-USA**. **S2CGI SA** will pay **CAPITAL IDEAS-USA** within a few business days of monies arriving in the **S2CGI SA'** bank account.

For this project, in aggregate, we need 157.8 million Euros. **CAPITAL IDEAS-USA** will raise 186 million Euros, getting paid **CAPITAL IDEAS-USA'** 10% success fees (18.6 million Euros) for each tranche as they come in, leaving the 167.4 million Euros needed to fund the project including engineering services.

**10. No Liability**

**S2CGI SA** shall have no liability to **CAPITAL IDEAS-USA** except for the payment of earned success fees based on ready, willing and able investors sourced and introduced (directly or indirectly) by **CAPITAL IDEAS-USA**.

**11.    Amendment**

This Agreement shall be capable of being amended only by a written instrument executed by the Parties.

**12.    Assignment**

Neither Party shall assign, sell or transfer, in any manner whatsoever, this Agreement or all or any of its rights hereunder, or agree to any such assignment, sale or transfer, without the prior written consent of the other Parties.

**13.    Entire Agreement**

This Agreement constitutes the entire agreement between the Parties in relation to the subject matter of this Agreement and supersedes all other agreements and undertakings (oral or written) hitherto exchanged by the Parties prior to the execution of this Agreement.

**14.    Notices**

Any notice given under this Agreement may be in text or WhatsApp and shall be considered delivered when sent. For important notices, it is suggested to confirm delivery by recipient by email, phone, and/or text.

16. **Governing Law and Dispute Resolution**

It is hereby agreed that this Agreement shall be governed and determined in accordance with the laws of the Central African Republic ("the CAR").

If there is a dispute, the parties will meet in person to resolve the dispute.

If the dispute cannot be resolved via in-person meetings, then the wronged party may choose any jurisdiction/venue in the CAR or the United States for arbitration, mediation, or any other legal process, and the other party will cooperate with the chosen jurisdiction/venue.

**IN WITNESS WHEREOF**, the Parties hereby memorialize this Agreement.

<u>**FOR: S2CGI SA**</u>
**Mr. Guerson NGANADEKOE**
(CEO of ITS and major shareholder of S2CGI SA)

_____

<u>**FOR: CAPITAL IDEAS-USA**</u>
**Mr. Carl WESCOTT**

_____
<u>Attached documents</u>: (2) passport copies

 Gmail                    **Carl Wescott <carlwescott01@gmail.com>**

_____

## THANK YOU!
1 message

**Carl Wescott** <carlwescott01@gmail.com>                                    Mon, Feb 5, 2024 at 4:44 PM
To: "Hupp, Louis (CSS)" <louis.hupp@sfgov.org>, Carl Wescott <carlwescott01@gmail.com>

Mr. Hupp,

I attached my original early December "dream scenario" that we're now pushing back a couple months to give me the 6 months I need to close my first deal.

I'm glad we can have a draft stipulation soon (likely this week), and that we can sign and submit and should have the Court order next week.

This will give me the full 6 months of $0 runway that I was hoping for with my passport and ability to travel, from March 2024 through August 2024, with the $5k/month of Child Support starting in September 2024.

--Carl



📄 **modify support december 2023 dream scenario.pdf**
    139K

 Gmail          **Carl Wescott <carlwescott01@gmail.com>**

## Re: THANK YOU! w/ summary
1 message

**Carl Wescott** <carlwescott01@gmail.com>                                                Mon, Feb 5, 2024 at 4:47 PM
To: "Hupp, Louis (CSS)" <louis.hupp@sfgov.org>, Carl Wescott <carlwescott01@gmail.com>

Mr. Hupp, I believe the new stipulation will be as attached.

As I'm not an attorney, I appreciate the help of the Department of Child Support Services attorney's help in drafting our stipulation.

--Carl

On Mon, Feb 5, 2024 at 4:44 PM Carl Wescott <carlwescott01@gmail.com> wrote:

Mr. Hupp,

I attached my original early December "dream scenario" that we're now pushing back a couple months to give me the 6 months I need to close my first deal.

I'm glad we can have a draft stipulation soon (likely this week), and that we can sign and submit and should have the Court order next week.

This will give me the full 6 months of $0 runway that I was hoping for with my passport and ability to travel, from March 2024 through August 2024, with the $5k/month of Child Support starting in September 2024.

--Carl

📄 **summary of new stipulation.pdf**
18K

 Gmail

 *EXHIBIT F*

**Carl Wescott <carlwescott01@gmail.com>**

## following up, too
1 message

**Carl Wescott** <carlwescott01@gmail.com>                                      Thu, Feb 8, 2024 at 3:26 PM
To: "Hupp, Louis (CSS)" <louis.hupp@sfgov.org>, Carl Wescott <carlwescott01@gmail.com>

Mr. Hupp,

Friendly reminder... I know everyone is busy including the Department of Child Support Services attorney... Checking in on the stipulation to sign which I'm hoping to receive soon...

We are expecting to sign this week and then be able to provide to the Court end of week or early next week so the Court clerk can provide to the Judge for signing and become a Court order next week, as I understood it.

I'll call you to check in, thanks.

--Carl

On Mon, Feb 5, 2024 at 4:47 PM Carl Wescott <carlwescott01@gmail.com> wrote:
Mr. Hupp, I believe the new stipulation will be as attached.

As I'm not an attorney, I appreciate the help of the Department of Child Support Services attorney's help in drafting our stipulation.

--Carl

On Mon, Feb 5, 2024 at 4:44 PM Carl Wescott <carlwescott01@gmail.com> wrote:

Mr. Hupp,

I attached my original early December "dream scenario" that we're now pushing back a couple months to give me the 6 months I need to close my first deal.

I'm glad we can have a draft stipulation soon (likely this week), and that we can sign and submit and should have the Court order next week.

This will give me the full 6 months of $0 runway that I was hoping for with my passport and ability to travel, from March 2024 through August 2024, with the $5k/month of Child Support starting in September 2024.

--Carl

 **Gmail**

EXHIBIT G

**Carl Wescott** <carlwescott01@gmail.com>

---

# Now a month later, new stip (Was: Re: THANK YOU! w/ summary)
3 messages

---

**Carl Wescott** <carlwescott01@gmail.com>
To: "Hupp, Louis (CSS)" <louis.hupp@sfgov.org>, Carl Wescott <carlwescott01@gmail.com>

Sun, Feb 18, 2024 at 7:09 AM

Mr. Hupp,

Given that we can't finalize this until the week after March 12th (with my new passport), here's the updated stipulation.

Putting this into the court format, next.

--Carl

On Mon, Feb 5, 2024 at 4:47 PM Carl Wescott <carlwescott01@gmail.com> wrote:
> Mr. Hupp, I believe the new stipulation will be as attached.
>
> As I'm not an attorney, I appreciate the help of the Department of Child Support Services attorney's help in drafting our stipulation.
>
> --Carl

On Mon, Feb 5, 2024 at 4:44 PM Carl Wescott <carlwescott01@gmail.com> wrote:

> Mr. Hupp,
>
> I attached my original early December "dream scenario" that we're now pushing back a couple months to give me the 6 months I need to close my first deal.
>
> I'm glad we can have a draft stipulation soon (likely this week), and that we can sign and submit and should have the Court order next week.
>
> This will give me the full 6 months of $0 runway that I was hoping for with my passport and ability to travel, from March 2024 through August 2024, with the $5k/month of Child Support starting in September 2024.
>
> --Carl

📄 **stipulation agreed to with Mr. Hupp.pdf**
18K

---

**Hupp, Louis (CSS)** <louis.hupp@sfgov.org>
To: Carl Wescott <carlwescott01@gmail.com>

Tue, Feb 20, 2024 at 8:09 AM

Hello Mr. Wescott,

It was already understood, whether you attempted to file a signed stipulation this month or waited until the March hearing, that your intent was to have 6 months of an active passport. My intent was to communicate this understanding when we last spoke, as well, when I spoke to Ms. Stephens. I am only waiting for an update from the hearing or stipulation filed in lieu of a court hearing. I hope all goes as planned.

Have a great day!

**From:** Carl Wescott <carlwescott01@gmail.com>
**Sent:** Sunday, February 18, 2024 6:10 AM
**To:** Hupp, Louis (CSS) <louis.hupp@sfgov.org>; Carl Wescott <carlwescott01@gmail.com>
**Subject:** Now a month later, new stip (Was: Re: THANK YOU! w/ summary)

This message is from outside the City email system. Do not open links or attachments from untrusted sources.

[Quoted text hidden]

---

**Carl Wescott** <carlwescott01@gmail.com>                                    Tue, Feb 20, 2024 at 11:39 AM
To: "Hupp, Louis (CSS)" <louis.hupp@sfgov.org>

Thank you Mr. Hupp.

I've now drafted the stipulation. Will send you a copy. If Monette signs ahead will submit to the Court ahead of time, though I don't think anything will happen prior to the hearing on March 12th, as the Court will wish to ensure we both understand what we are doing and wish to do this (that's what she said last time).

That will be the next email, new thread.

--Carl
[Quoted text hidden]